1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL EUGENE ROBINSON,                      No.  2:11-cv-02403-JAM-AC-P

12                   Petitioner,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14   WILLIAM KNIPP,

15                   Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  The petition, ECF No. 1, presents six claims challenging

19   petitioner's 2003 convictions for several violent sexual offenses including forcible oral

20   copulation, forcible penetration, and forcible rape.  Respondent has answered, ECF No. 16, and

21   petitioner has filed a traverse, ECF Nos. 18, 19.

22                                  BACKGROUND

23          On April 28, 2003, petitioner was convicted by a jury in Sacramento County Superior

24   Court on charges of oral copulation with force, in violation of Cal. Penal Code § 288a(c)(2),[1] two

25   counts of forcible sexual penetration by a foreign object (§ 289(a)(1)), and two counts of forcible

26   rape, (§ 261(a)(2)).  Lodged Doc. 10 (Abstract of Judgment).  As to all counts, the jury found true

27

28   [1] Further references are to the California Penal Code unless otherwise specified.

1

1   the enhancement allegation that petitioner personally used a deadly and dangerous weapon in the

2   commission of the offense.  (§§ 12022(b)(1) and 12022.3(a)).  Lodged Doc. 9 (California

3   Supreme Court Opinion, "Opinion") at 7.  Petitioner was sentenced to an aggregate term of 65

4   years imprisonment.  Id.

5           The California Supreme Court provided the following factual and procedural summary of

6   the case:[2]

7           On August 25, 1994, 24-year-old Deborah L. awoke to find a male
            adult stranger standing in her bedroom doorway wearing gloves and
8           holding a knife. He told Deborah to be quiet and that he was there
            "to get some pussy." When she screamed, he called her a "white
9           bitch" and threatened to kill her if she did not shut up. Based on his
            distinctive voice, his skin color, and his silhouette, Deborah thought
10          the man was African-American.

11          The man climbed on top of Deborah and held the knife to her chest;
            she cut her hand when she instinctively grabbed at the knife. The
12          man directed Deborah to cover her face with a pillow. He then
            fondled her breasts, placed his mouth on her vagina, inserted his
13          fingers in her vagina and rectum, and raped her. After losing and
            regaining an erection, he raped her a second time; this time he
14          withdrew his penis, ejaculated on her legs, and rubbed his semen on
            her stomach. As the man dressed, he said he would kill Deborah if
15          she looked at him. Once he was gone, she called 911.

16          Police officers promptly took Deborah to a medical facility where a
            rape kit was prepared, vaginal swabs were collected, and her cut
17          hand was stitched. The physician assistant who collected the
            vaginal swabs saw sperm on them. Jill Spriggs, an assistant
18          criminal laboratory director for the California Department of Justice
            (Department), also found semen present on a swab collected from
19          Deborah's vagina. In early August of 2000, Ms. Spriggs assayed
            that sperm to generate a genetic profile of the unknown male
20          suspect as determined by the presence or absence of markers at 13
            distinct DNA loci. Ms. Spriggs then used statistics to estimate, with
21          respect to three racial groups, the probability that more than one
            person would harbor that same series of markers.
22

23          The parties stipulated that, prior to September 2000, defendant's
            blood had been collected, his DNA was profiled at 13 loci, and his
24          profile had been entered into the Department's offender database. A
            Department of Justice criminalist testified the database is kept in
25          the hope of matching DNA samples from unsolved crimes with
            known profiles, and that such a match is called a "cold hit."

26

27   [2] These facts as recited by the state court are presumed true for purposes of this court's review
     under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and the petitioner
28   does not contend otherwise.  See 28 U.S.C. § 2254(e)(1).

Four days before the six-year statute of limitations would have expired, a felony complaint was filed against "John Doe, unknown male," describing him by his 13-loci DNA profile. The next day, the trial court found probable cause in the complaint, and an arrest warrant issued for "John Doe," incorporating by reference that DNA profile. As relevant here, "John Doe" was identified as an "unknown male with Short Tandem Repeat (STR) Deoxyribonucleic Acid (DNA) Profile at the following Genetic Locations, using the Cofiler and Profiler Plus Polymerase Chain Reaction (PCR) amplification kits: D3S1358 (15, 15), D16S539 (9, 10), THO1 (7, 7), TPOX (6, 9), CSF1PO (10, 11), D7S820 (8, 11), vWa (18, 19), FGA (22, 24), D8S1179 (12, 15), D21S11 (28, 28), D18S51 (20, 20), D5S818 (8, 13), D13S317 (10, 11), with said Genetic Profile being unique, occurring in approximately 1 in 21 sextillion of the Caucasian population, 1 in 650 quadrillion of the African American population, 1 in 420 sextillion of the Hispanic population."

In September, a criminalist who searched the Department's offender database using the DNA profile Ms. Spriggs had developed in the Deborah L. case generated a "cold hit" match between the 13–loci DNA profile in the John Doe arrest warrant and defendant Robinson's profile in the state's DNA database. Based on the match, an amended arrest warrant with Robinson's name issued; it was executed on September 15.

After defendant's arrest on September 15, his blood was collected, and Ms. Spriggs conducted an independent DNA analysis using that new blood sample. Comparing defendant's DNA profile from that blood with the DNA profile obtained earlier from the evidentiary semen from the vaginal swab, Ms. Spriggs found the two profiles matched "at all 13 loci." Based on her statistical calculations made to determine the frequency of a genetic profile in a random unrelated population, Ms. Spriggs testified that she estimated that the probability that two people would share identical DNA patterns at each of the 13 loci tested is one in 650 quadrillion (650 followed by 15 zeros) in the African–American population, one in six sextillion (6 followed by 21 zeros) in the Caucasian population, and one in 33 sextillion (33 followed by 21 zeros) in the Hispanic population.  Ms. Spriggs testified that there had been no reported cases of two people who are not identical twins matching at all 13 loci.

Opinion at 4-7. (footnotes omitted).

On direct appeal, petitioner argued that his prosecution did not commence upon issuance of the arrest warrant because the warrant was not sufficiently particular under California law, and that the trial court erred by failing to suppress the DNA evidence, admitting certain expert testimony, and imposing upper terms of imprisonment.  Lodged Doc. 3 at 4-5, n. 4.  In a partially published opinion, the California Court of Appeal affirmed the judgment, concluding, in the

3

1  published portion, that the DNA profile of the perpetrator of a sexual offense that is incorporated

2  in an arrest warrant is sufficiently particular under California law; and, in the unpublished

3  portion, rejecting petitioner's remaining claims of trial court error.  Id. at 4-5.

4       A petition for review was granted by the California Supreme Court with respect to the

5  following issues:  (1) whether the issuance of a "John Doe" complaint and arrest warrant timely

6  commences a criminal action for purposes of the statute of limitations; (2) whether an unknown

7  suspect's DNA profile satisfies the "particularity" requirement for an arrest warrant; and (3)

8  whether there is a remedy for the unlawful collection of genetic material under the DNA Forensic

9  Identification Database and Data Bank Act of 1998 (Pen. Code § 295 et seq.).  The court granted

10  review on a fourth issue, but ordered briefing deferred pending the disposition of a related issue in

11  a pending case.  Lodged Doc. 5 (California Supreme Court Order Granting Petition for Review).

12       In a published opinion, the California Supreme Court affirmed the judgment of

13  conviction,[3] reasoning as follows:

14  
15  
16  
17  
18  
19  
> [W]e conclude that, in cases in which the warrant identifies the perpetrator by his or her unique DNA profile only, the statute of limitations is satisfied if the prosecution is commenced by the filing of the "John Doe" arrest warrant within the limitations period.  In reaching this conclusion, we find that an unknown suspect's unique DNA profile satisfies the "particularity" requirement for an arrest warrant. (§ 804, subd. (d).) Although defendant's blood was mistakenly collected under the Act, we conclude that the law enforcement personnel errors in this case do not trigger the exclusionary rule. Accordingly, we affirm the Court of Appeal's judgment.

20  Opinion at 3 (footnote omitted).

21       Following the California Supreme Court's affirmance, a petition for a writ of certiorari

22  was filed on petitioner's behalf in the United States Supreme Court.  Lodged Doc. 11.  The

23  petition was summarily denied on January 12, 2012.  Lodged Doc. 14.  Petitioner did not

24  collaterally attack his judgment of conviction by filing a habeas petition in state court.

25       Petitioner seeks federal habeas relief on the following grounds:  (1) his right to due

26  process under the Fourteenth Amendment and the California Constitution was violated when a

27  
28  

---

[3] The Court remanded to the trial court to correct a clerical error in the abstract of judgment and the minute order of sentencing.

4

1  "John Doe" complaint and arrest warrant were issued to timely commence the action; (2) the

2  particularity requirements for an arrest warrant under the Fourth Amendment, the California

3  Constitution, and Cal. Penal Code § 804, were not satisfied by the inclusion of a DNA profile as a

4  description of the suspect; (3) the involuntary collection of his blood for DNA analysis violated

5  his right to be free from unlawful searches and seizures under the Fourth Amendment and the

6  California Constitution; (4) his right to due process under the Sixth and Fourteenth Amendments

7  was violated by the trial court's admission of expert testimony to explain the probability of  the

8  DNA match obtained through the database search; (5) his right to due process under the Sixth and

9  Fourteenth Amendments was violated by the trial court's admission of evidence derived from the

10  use of a statistical methodology that was not generally accepted in the scientific community; and

11  (6) his right to due process and a fair trial was violated when the trial court allowed evidence of

12  separate probability statistics for a DNA match among three major ethnic groups, rather than

13  using a general, non-ethnic population.  ECF 1.

14            STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

15            28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

16  1996 ("AEDPA"), provides in relevant part as follows:

17            (d) An application for a writ of habeas corpus on behalf of a person
18            in custody pursuant to the judgment of a state court shall not be
              granted with respect to any claim that was adjudicated on the merits
19            in State court proceedings unless the adjudication of the claim –

20            (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as
21            determined by the Supreme Court of the United States; or

22            (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
23            State court proceeding.

24            The statute applies whenever the state court has denied a federal claim on its merits,

25  whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

26  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

27  absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

28  Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

5

1   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

2   "The presumption may be overcome when there is reason to think some other explanation for the

3   state court's decision is more likely."  Id. at 785.

4          The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

5   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

6   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

7   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

8   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

9   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

10  what law is "clearly established" and what constitutes "unreasonable application" of that law.

11  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

12  1057 (9th Cir. 2004).

13         A state court decision is "contrary to" clearly established federal law if the decision

14  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

15  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

16  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

17  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

18  was incorrect in the view of the federal habeas court; the state court decision must be objectively

19  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

20         Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

21  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

22  reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

23  focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the

24  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

25  state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

26  Cir. 2008) (en banc).

27  ////

28  ////

6

DISCUSSION

I.      Claim One:  "John Doe" Complaint and Arrest Warrant

Petitioner claims that use of a "John Doe" complaint and arrest warrant to timely commence the criminal action unconstitutionally circumvented the statute of limitations and denied him due process under the Fourteenth Amendment and the California Constitution.  ECF 1 at 23[4].

Petitioner first raised this issue in a pretrial motion to dismiss, which was denied by the trial court following an evidentiary hearing.  1 Lodged Doc. 16 at 1-137.[5]  The same claim was rejected in reasoned opinions by both the California Court of Appeal and the California Supreme Court.  Lodged Doc. 3 at 18, Opinion at 27.  Petitioner renewed this claim in a petition for writ of certiorari, which was summarily denied.  Lodged Doc. 14.  Petitioner raises the same issue before this court and, for the reasons discussed below, the undersigned recommends that the claim be denied.

A. State Law

California law allows for the use of "John Doe" arrest warrants as follows:

> [a] warrant of arrest shall specify the name of the defendant or, if it is unknown to the magistrate, judge, justice, or other issuing authority, the defendant may be designated therein by any name. It shall also state the time of issuing it, and the city or county where it is issued, and shall be signed by the magistrate, judge, justice, or other issuing authority issuing it with the title of his office and the name of the court or other issuing agency.

Cal. Penal Code § 815.

The California legislature has established a six-year statute of limitations for offenses that are punishable by imprisonment for eight years or more.  Cal. Penal Code § 800.  California law further provides that prosecution for an offense can commence when an arrest warrant is issued, "provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint."  Cal. Penal Code § 804.  At the time these

---

[4] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.
[5] The Reporter's Transcript on Appeal is lodged in this court as Lodged Doc. 16, Volumes 1-20.

7

1  crimes were committed, each offense was punishable by a maximum term of eight years in state

2  prison.  Lodged Doc. 10.

3              B.  Background

4        The complaint was filed on August 21, 2000, four days before the statute of limitations

5  was set to expire, and the arrest warrant was issued the following day for "John Doe, unknown

6  male," on charges stemming from the August 25, 1994 assault of Deborah L.  Opinion at 26.  The

7  complaint described John Doe by his unique 13 loci DNA profile, and that description was

8  incorporated by reference into the arrest warrant.  Id. at 27.  Approximately three weeks later, the

9  Department's offender database was searched using the DNA profile that was originally

10  developed in 1994, which generated a "cold hit" match between the DNA profile in the "John

11  Doe" arrest warrant and petitioner's DNA profile in the state's DNA database.[6]  Id. at 6.  Based

12  on that match, an amended arrest warrant with petitioner's name on it was issued, and the warrant

13  was executed on September 15, 2000.  Id.  Following his arrest, petitioner's blood was collected

14  and an independent DNA analysis was conducted using the new blood sample.  Id.  The new

15  DNA profile was then compared to the earlier profile, and yielded a match at all 13 loci.  Id.

16  Expert testimony at trial indicated that the probability that two people would share identical DNA

17  patterns at each of the 13 loci tested was one in 650 quadrillion in the African-American

18  population, one in six sextillion in the Caucasian population, and one in 33 sextillion in the

19  Hispanic population.  Id. at 6-7.  Further testimony indicated that there had been no reported cases

20  of two people matching at all 13 loci who were not identical twins.  Id. at 7.

21              C.  Petitioner's Argument

22        Petitioner states that the prosecution of this case had to commence by August 24, 2000 in

23  order to satisfy California's statute of limitations.  ECF 1 at 26.  Petitioner further contends that,

24  under § 804, the filing of a "John Doe" complaint and arrest warrant four days before the

25  limitations period was set to expire did not lawfully commence the action, which is therefore

26

27  _____

   [6]  The parties stipulated that, prior to September of 2000, petitioner's blood had been collected

28  and his DNA was profiled at 13 loci, and that profile was entered into the Department's offender
   database.  Opinion at 5.

1   barred under California's statute of limitations. Id. at 27-28. Petitioner concedes that "John Doe"

2   warrants may be used in California, but argues that the legislative intent behind § 804, as

3   expressed in the official comments of the California Law Revision Commission, indicate that

4   such warrants were not intended to satisfy the statute of limitations, or to "stop the running of an

5   expiring limitations period." ECF 1 at 30. Petitioner complains that the prosecution obtained the

6   "John Doe" arrest warrant in order to circumvent the six-year statute of limitations that was duly

7   enacted by the state legislature, in the hope of eventually identifying and prosecuting the

8   unknown perpetrator. Id. at 32-33. Petitioner contends that allowing a "John Doe" warrant to

9   commence the action to render the prosecution timely in this manner subverts the legislature's

10  intent and violates his right to due process. Id. at 34.

11                 D. Respondent's Argument

12       Respondent argues that habeas relief must be denied under § 2254(d), because the state

13  court's rejection of petitioner's due process claim was not contrary to, or an unreasonable

14  application of, controlling Supreme Court precedent. ECF 16 at 15-16.

15                 E. California Supreme Court Opinion

16       The California Supreme Court explicitly rejected the premise that the legislative history of

17  § 804 indicates that "John Doe" warrants were not intended to satisfy the statute of limitations.

18  Opinion at 37-45. The court began by noting that the plain language of § 815 allows for the

19  issuance of an arrest warrant identifying the suspect by a fictitious name if his name is unknown.

20  Id. at 38. The court then explained that the plain language of § 804(d), providing that prosecution

21  for an offense commences with the issuance of an arrest warrant that describes the defendant with

22  the particularity required for an indictment, information, or complaint, does not exclude "John

23  Doe" arrest warrants from the general category of arrest warrants that ordinarily commence a

24  prosecution in satisfaction of the statute of limitations. Id. at 38-39. The court saw no reason not

25  to give effect to the plain language of both statutes. Id. at 39.

26        Further, the court made it clear that the official comments of the California Law Revision

27  Commission are not conclusive evidence of legislative intent and, in any case, neither the

28  California legislature nor the official comments addressed the precise issue raised by this case;

1   which was whether the use of a fictitious name, coupled with the unique DNA profile of the

2   defendant, identified the defendant with enough certainty such that the warrant informed the

3   person of the prosecution.  Id. at 39-40.  The court went on to examine law from other states

4   approving the use of indictments based on a suspect's DNA profile, and agreed with their

5   conclusion that a DNA indictment was an appropriate method to prosecute individuals charged

6   with committing the most heinous criminal acts.  Id. at 40-43.  The court concluded that the arrest

7   warrant in this case, which used a fictional name coupled with petitioner's unique DNA profile,

8   was sufficient to identify him with the particularity required by California law, thereby satisfying

9   his constitutional right to fair notice.  Id. at 45.

10          F.  Analysis

11               1.  State Law Claim

12          To the extent that petitioner's claim is based on alleged violations of state law or the

13   California Constitution, it is not cognizable on federal habeas review.  Estelle v. McGuire, 502

14   U.S. 62, 67 (1991) ("[i]t is not the province of a federal habeas court to reexamine state-court

15   determinations on state-law questions. …[i]n conducting habeas review, a federal court is limited

16   to deciding whether a conviction violated the Constitution, laws, or treaties of the United

17   States.").  Here, the California Supreme Court carefully considered petitioner's argument that a

18   "John Doe" arrest warrant accompanied by a DNA profile "circumvented" the limitations period

19   prescribed by the California legislature, thereby denying him due process under both the

20   California Constitution and the Fourteenth Amendment.  Opinion at 37-45.  The California

21   Supreme Court rejected petitioner's legislative intent argument and determined that there was

22   nothing in the plain language of §§ 804 and 815 to indicate that the state legislature intended to

23   exclude "John Doe" arrest warrants from the general category of arrest warrants that would

24   normally commence a prosecution and satisfy California's statute of limitations.  Id. at 39.  In

25   light of this determination, the court concluded that the "John Doe" arrest warrant, describing

26   petitioner by his unique DNA profile, satisfied the particularity requirements of California law,

27   therefore the instant prosecution was properly commenced within the six-year statute of

28   limitations.  Id. at 45.  The California Supreme Court found no error under state law, and a federal

10

1   habeas court is bound by the state courts' interpretation and application of state law.  <u>Bradshaw v.</u>

2   <u>Richey</u>, 546 U.S. 74, 76 (2005).

3                              2.  <u>Federal Claim</u>

4        Petitioner's Fourteenth Amendment due process challenge also fails, as there is no clearly

5   established federal law stating that a "John Doe" complaint and arrest warrant cannot timely

6   commence a criminal action and thereby satisfy a state's statute of limitations.  If there is no U.S.

7   Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court,

8   the state court's decision cannot be contrary to, or an unreasonable application of, clearly

9   established federal law.  <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (per curiam).  Here,

10  there is no U.S. Supreme Court authority holding that a "John Doe" arrest warrant cannot

11  commence a criminal action in satisfaction of a statute of limitations, or even addressing the

12  question.  Accordingly, the California Supreme Court's decision rejecting petitioner's claim was

13  not contrary to, or an unreasonable application of, clearly established Federal law, as determined

14  by the Supreme Court of the United States.  <u>Moses v. Payne</u>, 543 F.3d 1090, 1098 (9th Cir. 2008)

15  ("a state court's decision cannot be contrary to a Supreme Court decision that provides 'no

16  categorical answer' to the question before the state court.").

17     II.  <u>Claim Two:  Challenge to the Particularity of the Arrest Warrant</u>

18        In this related claim petitioner contends that the inclusion of his DNA profile in the "John

19  Doe" complaint and arrest warrant was insufficient to satisfy the particularity requirements for an

20  arrest warrant as set forth in the Fourth Amendment, the California Constitution, and Cal. Penal

21  Code § 804.  ECF 1 at 37.  For the reasons discussed below, the undersigned recommends that

22  this claim be denied.

23               A.  <u>Background</u>

24        As discussed above, petitioner's motion to dismiss was denied by the trial court following

25  a lengthy pretrial hearing, after which the court concluded that the arrest warrant satisfied the

26  particularity requirements of the Fourth Amendment, and was sufficient to commence the

27  prosecution and toll the statute of limitations.  Lodged Doc. 16 at 132-37.  Petitioner's claim was

28  also briefed before and thoroughly considered by the California Court of Appeal, which issued a

                                            11

1    reasoned decision rejecting the claim.  Lodged Doc. 1, 2, & 3.

2                        B.  <u>California Supreme Court Opinion</u>

3        The California Supreme Court addressed petitioner's Fourth Amendment claim as

4    follows:  "Under federal and state law, an accusatory pleading may issue with a fictitious name

5    provided it names or describes the person being charged with reasonable certainty."  Opinion at

6    29.  The court emphasized that "[t]he constitutional and statutory requirements of particularity are

7    satisfied if the warrant 'imposes a meaningful restriction upon the objects to be seized,'" and

8    noted that "[t]he requirement of reasonable particularity 'is a flexible concept, reflecting the

9    degree of detail available from the facts known to the affiant and presented to the issuing

10   magistrate.'"  Opinion at 30-31.  (citations omitted).  Applying this standard, the court determined

11   that "at the time the John Doe arrest warrant issued and the John Doe complaint was filed in this

12   case, there was no more particular, accurate, or reliable means of identification available to law

13   enforcement than the suspect's unique DNA profile."  <u>Id.</u> at 31.

14       The court went on to examine relevant Ninth Circuit authority in conjunction with several

15   cases from other states that had also considered the validity of arrest warrants describing a suspect

16   by his DNA profile.  Opinion at 30-33.  Based on its analysis of the relevant case law, the

17   California Supreme Court concluded that the arrest warrant's description of petitioner through a

18   13 loci DNA profile with a random match probability that essentially eliminated any possibility

19   that it could be duplicated in the human population,  satisfied the Fourth Amendment's

20   requirement that the person seized be described with particularity.  Opinion at 33.

21       As for petitioner's argument under the California Constitution, the California Supreme

22   Court made it clear that the state constitution parallels the relevant language of the Fourth

23   Amendment, and that the arrest warrant "described the defendant with sufficient particularity to

24   avoid a violation of the warrant particularity requirement of our state Constitution."  Opinion at

25   30, 34.  The court went on to consider whether the particularity requirement set forth in § 804(d)

26   was satisfied, such that the felony prosecution was commenced for purposes of the statute of

27   limitations.  Opinion at 34-35.  The court examined the state statutory scheme and interpretive

28   case law regarding the particularity required for an arrest warrant to commence prosecution for

                                            12

1   purposes of the statute of limitations, and again concluded that there was no violation of state law.

2   Id. at 37.

3           C.   Analysis

4                1.   State Law Claim

5           Petitioner raises the same arguments he made in state court on direct appeal, essentially

6   trying to relitigate his motion to dismiss based on the validity of the "John Doe" arrest warrant.

7   ECF 1 at 37-56.  Again, to the extent petitioner's claim is based on alleged violations of state law

8   it is not cognizable on federal habeas review.  Estelle, 502 U.S. at 67.  Because the California

9   Supreme Court found no error under state law, this federal habeas court is bound by the state

10  courts' interpretation and application of its own law.  Bradshaw, 546 U.S. at 76.

11               2.   Federal Claim

12          Petitioner's claim for relief under the Fourth Amendment must also fail.  A Fourth

13  Amendment claim is not cognizable in federal habeas proceedings if a defendant has had a full

14  and fair opportunity to litigate the claim in state court.  Stone v. Powell, 428 U.S. 465, 481-82

15  (1976).  "The relevant inquiry is whether [defendant] had the opportunity to litigate his claim, not

16  whether he did in fact do so or even whether the claim was correctly decided."  Ortiz–Sandoval v.

17  Gomez, 81 F.3d 891, 899 (9th Cir.1996).  Here, petitioner took full advantage of the opportunity

18  to litigate his Fourth Amendment claim in state court, first by filing a motion to dismiss in the

19  trial court and then by presenting the same claim to the California Court of Appeal and the

20  California Supreme Court on direct review.  Lodged Doc. 16 at 1-137, Lodged Doc. 1, 2, 3, & 6.

21  Petitioner had a full and fair opportunity to litigate the validity of the arrest warrant in state court,

22  therefore there is no basis for federal habeas relief.  Myers v. Rhay, 577 F2d 504, 508 (9th Cir.

23  1978) (even assuming that an arrest is invalid due to an unconstitutionally issued arrest warrant,

24  there is no basis for relief in light of Stone, 428 U.S. at 494); Terrovona v. Kincheloe, 912 F. 2d.

25  1176, 1178 (9th Cir. 1990) (finding that Stone and Myers bar federal review of a state prisoner's

26  warrantless arrest claim).

27  ////

28  ////

13

1    III.  Claim Three:  Involuntary Collection of Blood for DNA Analysis

2           Petitioner's next claim is twofold.  First, he claims that his Fourth Amendment rights were

3    violated by the involuntary collection of a blood sample from which his DNA profile was

4    developed and included in the state offender database.  Second, he contends that the appropriate

5    remedy for the unlawful seizure is reversal of his conviction, exclusion of his profile from the

6    database, and destruction of his blood sample.  ECF 1 at 57.

7           A.  Background

8           The DNA and Forensic Identification Data Base and Data Bank Act of 1998 (the "Act")

9    mandates that any person convicted of a "qualifying offense" under the statute must provide a

10   blood specimen for law enforcement identification analysis and inclusion in the state's DNA and

11   Forensic Identification Database.  Cal. Penal Code § 296.  On March 2, 1999, petitioner was an

12   inmate at the Rio Cosumnes Correctional Center serving a sentence for two misdemeanor

13   convictions, and awaiting transfer to state prison for a parole revocation stemming from an earlier

14   conviction for felony first degree burglary.  Opinion at 10.  At the time the sample was drawn,

15   felony burglary was not listed as a qualifying offense requiring collection of blood for DNA

16   analysis.  Id. at n. 15.  Law enforcement personnel, mistakenly believing that petitioner had been

17   convicted of a qualifying offense under the Act, collected his blood sample and submitted it to the

18   laboratory database section for verification to confirm that petitioner was a qualified offender.  Id.

19   at 9-10.  At the time his blood was drawn and analyzed, petitioner had not been convicted of any

20   qualifying offenses.  However, through a series of errors in the verification process, the blood

21   sample was mistakenly deemed to be qualified for inclusion in the state database.  Id. at 11.

22          Petitioner filed a motion to suppress seeking to exclude any evidence derived from the

23   mistaken inclusion of his DNA profile in the state database.  1 Lodged Doc. 16 at 156.  The trial

24   court denied the motion after a two-day evidentiary hearing, finding that petitioner was subject to

25   a search as a valid condition of his parole, and, in the alternative, that correctional officials made

26   every effort to avoid mistakes while acting under a good faith belief that he was a qualified

27   offender.  2 Lodged Doc. 16 at 528-35.  In a reasoned decision, the California Court of Appeal

28   concluded that the trial court properly denied petitioner's motion to suppress the evidence.

14

1    Lodged Doc. 3 at 36.

2                    B. California Supreme Court Opinion

3          The California Supreme Court agreed, concluding as follows:

4              [W]e hold that the challenged errors do not, by themselves, "require
               the 'extreme sanction of exclusion.'" We agree with the trial court
5              that the law enforcement personnel errors in this case were the
               result of negligence, "rather than systematic error or reckless
6              disregard of constitutional requirements," that the unlawful
               collection of genetic material under the Act was not "sufficiently
7              deliberate that exclusion can meaningfully deter it," and that the
               law enforcement personnel were not sufficiently culpable that such
8              deterrence is worth the price paid by the justice system.

9              We have analyzed the nonconsensual extraction of defendant's
               blood for the March 2, 1999 blood sample as a state statutory
10             violation that did not violate the Fourth Amendment, and,
               alternatively, as an assumed federal constitutional violation. In
11             either case, we agree with the Court of Appeal that "the
               exclusionary rule is inapplicable to suppress the [blood and DNA
12             test] evidence in this case."

13   Opinion at 25-26.  (internal citations and footnotes omitted).

14                   C. Analysis

15         This claim is barred by Stone v. Powell, supra.  The state provided petitioner with an

16   opportunity for full and fair litigation of his Fourth Amendment claim.  Even if there was a

17   Fourth Amendment violation, therefore, petitioner cannot obtain a remedy in federal court.

18   Stone, 428 U.S. at 482 ("[W]here the State has provided an opportunity for full and fair litigation

19   of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted

20   federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or

21   seizure was introduced at his trial.").

22      IV.  Claim Four:  Challenge to the Statistical Methodology Used at Trial

23         Petitioner claims that his right to due process was violated by the trial court's admission of

24   expert testimony to explain the probability of a match between the DNA profile derived from the

25   crime scene, and his own DNA profile obtained from the blood sample taken after his arrest.

26   ECF 1 at 83-125.  Specifically, he argues that the statistical methodology used to calculate the

27   random match probability – the so-called "product rule" – was not generally accepted by the

28

                                                    15

1    scientific community in cases involving a "cold hit" match.  ECF 1 at 83, 85.[7]

2                       A.  Background

3            Petitioner's claim was considered and rejected by the trial court following a lengthy

4    pretrial hearing, after which the court concluded that the statistical approach used was generally

5    accepted and should apply in his case. 3 Lodged Doc. 16 at 700 through 9 Lodged Doc. 16 at

6    2665.  In a reasoned opinion, the California Court of Appeal upheld the trial court's ruling finding

7    the evidence admissible.  Lodged Doc. 3 at 37-48.  The appellate court explained petitioner's

8    claim as follows:

9            Statistical evidence was introduced at trial to explain the rarity of
10           the DNA match between the evidentiary sample and defendant's
             blood sample taken upon his arrest.  The statistical calculation was
11           arrived at by applying the modified product rule.  (MPR.)

12           Defendant contends the DNA evidence was erroneously admitted
             under *Kelly/Frye*, because there is no generally accepted statistical
13           method for calculating the probability of a DNA match when a
             suspect is identified by means of a "cold hit."  A cold hit is a match
14           obtained by comparing the DNA profile derived from an
             evidentiary sample with the DNA profile of an individual included
15           in an offender data base.  Defendant asserts there is a deep division
             among the experts on how to calculate the chance that a cold hit
16           match is coincidental.  Respondent contends the MPR is admissible
             under *Kelly/Frye* because it is generally accepted in the relevant
17           scientific community to calculate the statistical frequency of a
             match between two DNA profiles.

18           We agree with respondent and hold that the evidence of MPR and
19           its application in this case were properly admitted.

20   Id. at 37-38.

21           Petitioner renewed this claim before the California Supreme Court, which granted review

22   but stayed briefing pending its disposition of a similar issue in People v. Nelson, 43 Cal. 4th 1242

23   (2008).  Following its decision in Nelson, the California Supreme Court resolved the issue against

24   petitioner, and declined further comment.  Opinion at 3, n.6.

25   ////

26

27   _____
     [7] The product rule is a statistical method used to calculate the rarity of a sample in a given
     population.  This method was explained by the California Supreme Court in some detail in People
28   v. Soto, 21 Cal. 4th 512, 524-25 (1999).

                                           16

1    B. <u>Analysis</u>

2         Petitioner reiterates the same claim that he raised before the state courts: that the expert

3    testimony was inadmissible because the statistical methodology relied upon by the witnesses was

4    not generally accepted in a "cold hit" case.  Plaintiff invokes both the state standard for

5    admissibility of expert testimony set forth in <u>People v. Kelly</u>, 17 Cal.3d 24 (1976), and the federal

6    standard set forth in <u>Frye v. United States</u>, 293 F. 1013 (C.A.D.C. 1923).  ECF 1 at 92-93.

7    1. <u>State Law Claim</u>

8         The California Supreme Court has summarized the <u>Kelly</u> test as follows:  "The

9    admissibility of expert testimony based on 'a new scientific technique' requires proof of its

10   reliability—i.e., that the technique is 'sufficiently established to have gained general acceptance

11   in the particular field to which it belongs.'"  <u>Nelson</u>, 43 Cal. 4th at 1257.  In <u>Nelson</u>, the

12   California Supreme Court addressed whether the application of the product rule to a cold hit case

13   was indeed a new scientific technique that required general scientific acceptance in satisfaction of

14   the <u>Kelly</u> standard.  <u>Id.</u> at 1261-65.  The court determined that use of the product rule in a cold hit

15   case did not involve the application of a new scientific technique, and was therefore not subject to

16   the <u>Kelly</u> test.  <u>Id.</u> at 1263-64.  The court found that the product rule could be reliably used to

17   show the rarity of a genetic profile in a population group, leaving it within the trial court's

18   discretion to determine the relevance of the technique to the criminal prosecution.  <u>Id.</u> at 1265.

19   The court went on to conclude that a statistical calculation derived through use of the product rule

20   was both relevant and admissible under California law, even in a cold hit case.  <u>Id.</u> at 1266-67.

21        Once again, to the extent that petitioner's claim is grounded in state law, it is not

22   cognizable on federal habeas review.  <u>Estelle</u>, 502 U.S. at 67.  This federal habeas court is bound

23   by the state courts' interpretation and application of its own law.  <u>Bradshaw</u>, 546 U.S. at 76.  State

24   evidentiary rulings do not provide a basis for federal habeas relief unless the admission of the

25   evidence violated the petitioner's due process right to a fair trial.  <u>Estelle</u>, 502 U.S. at 68.  The

26   court now turns to that question.

27   2. <u>Federal Claim</u>

28        Petitioner claims that the trial court's admission of the expert testimony prejudiced his

17

1    defense, thereby rendering the trial fundamentally unfair in violation of his Sixth and Fourteenth

2    Amendment right to due process.  ECF 1 at 121-22.  The Unites States Supreme Court has not

3    addressed whether the use of a particular statistical methodology to explain the probability of a

4    random DNA match in a "cold hit" case violates due process, nor has it "made a clear ruling that

5    admission of irrelevant or prejudicial evidence constitutes a due process violation sufficient to

6    warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

7    Accordingly, the state court cannot have unreasonably applied federal law within the meaning of

8    the AEDPA.  See Wright v. Van Patten, 552 U.S. at 125-26; Moses v. Payne, 543 F.3d at 1098

9    (9th Cir. 2008).

10          The evidentiary standard on which petitioner relies – the Kelly-Frye rule – is not

11    constitutionally required and does not constitute "clearly established Federal law."  Frye, which

12    required the proponent of scientific evidence to demonstrate "general acceptance" of the evidence

13    "in the particular field in which it belong[ed]," was the decision of a lower federal court.  Frye,

14    293 F. at 1013.  Decisions of lower federal courts do not constitute "clearly established federal

15    law" for purposes of 28 U.S.C. § 2254(d).  Lockyer v. Andrade, 538 U.S. at 71-72.  The U.S.

16    Supreme Court never endorsed Frye, and later held that held that its widely-adopted "general

17    acceptance" test had been displaced by the less stringent standard provided by the Federal Rules

18    of Evidence.  The Court held in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589

19    (1993), that Rule 702 requires district judges to be gatekeepers for proposed scientific evidence

20    by assuring "that any and all scientific testimony or evidence admitted is not only relevant, but

21    reliable."  Accordingly, an expert's testimony must be based on scientific knowledge that is

22    grounded "in the methods and procedures of science," and consists of more than just "subjective

23    belief or unsupported speculation."  Id. at 590-91.  Daubert, like Frye, states a non-constitutional

24    evidentiary rule that applies in the federal trial courts.  Accordingly, it provides no basis for

25    habeas relief.

26          Even if the Daubert rule were compelled by due process – which the Supreme Court has

27    not suggested, let alone clearly established – there would be no unreasonable application on the

28    facts of this case.  The trial court diligently performed its gatekeeping function by conducting a

1  lengthy evidentiary hearing and considering the testimony of a number of different experts before

2  making specific findings on the record describing why the statistical methodology employed in

3  this case was relevant and reliable.  3 Lodged Doc. 16 at 700-9 Lodged Doc. 16 at 2652-65.  The

4  trial court's ruling finding the expert testimony admissible to explain the probability of a random

5  DNA match did not render petitioner's trial fundamentally unfair.  See Estelle, 502 U.S. at 70

6  (finding no due process violation where the evidence sought to be admitted is relevant to the

7  case).  Accordingly, the California Supreme Court's decision affirming the trial court's ruling on

8  this issue was not contrary to, or an unreasonable application of, clearly established federal law.

9      V.  Claim Five:  Challenge to the Application of the Statistical Methodology Used at Trial

10         In this closely related claim, petitioner contends that his right to due process and a fair

11 trial was violated by the trial court's erroneous admission of evidence that was derived from the

12 use of a statistical methodology that had not garnered general acceptance in the scientific

13 community.  ECF 1 at 126-128.

14         Respondent argues that this specific claim is unexhausted as phrased in the federal petition

15 and should be dismissed on that basis.  ECF 16 at 30.  However, because this claim is essentially

16 a variant or sub-claim of Claim Four, the undersigned will consider it on the merits.

17         As discussed above in relation to Claim Four, the trial court conducted a lengthy pretrial

18 hearing addressing whether the statistical methodology propounded, the product rule, was

19 generally accepted under the California standard set forth in Kelly, and concluded that it was.  9

20 Lodged Doc. 16 at 2661.  The California Supreme Court upheld the trial court's decision as a

21 matter of state law.  Lodged Doc. 9 at 3, n.6.

22         Petitioner suggests that his own argument must fail if this court determines that the trial

23 court applied the correct statistical methodology.  Id. at 127.  However, in deciding whether

24 petitioner's federal right to due process has been violated, it is not the role of this court to decide

25 whether the trial court applied the correct statistical approach.  Rather, it is the function of this

26 court to determine whether the admission of evidence derived from this approach rendered

27 petitioner's trial fundamentally unfair.  Williams v. Taylor, 529 U.S. 362, 375 (2000) (finding

28 that relief should be granted when a constitutional error renders a trial fundamentally unfair).

19

1    Petitioner states that he has "no quarrel with the specific figures the crime lab developed from the

2    data, only with the method it used in arriving at those figures." ECF 1 at 127. This amounts to a

3    concession that there was no prejudice from the trial court's admission of the evidence.

4    Therefore it stands to reason that admission of the evidence did not render petitioner's trial

5    fundamentally unfair. Accordingly, the state court's rejection of this claim was not contrary to, or

6    an unreasonable application of, clearly established federal authority.

7          The other reasons set forth above for denying Claim Four apply equally to Claim Five.

8          VI. <u>Claim Six: Challenge to Statistical Estimates Based on Ethnic Groups</u>

9          Petitioner's final claim is that the trial court violated his right to due process and deprived

10   him of a fair trial because it lowered the prosecution's burden of proof by allowing evidence of

11   separate probability statistics for a DNA match among Caucasian, African-American, and

12   Hispanic populations. ECF 1 at 129-135.

13                A. <u>Background</u>

14         At trial, the prosecution presented testimony from a DNA expert concerning the frequency

15   with which petitioner's genetic profile would occur among one of three main racial groups. 14

16   Lodged Doc. 16 at 4020-23. The expert testified that it would appear in one in 650 quadrillion in

17   the African-American population, one in 6 sextillion in the Caucasian population, and one in 33

18   sextillion in the Hispanic population. <u>Id.</u> at 4022.

19         The California Court of Appeal rejected petitioner's claim of trial court error, finding that

20   calculating the statistical probability of a DNA match using the three different racial groups was

21   entirely appropriate because the victim in this case could not definitively identify the race of her

22   assailant. Lodged Doc. 3 at 47-48. The court concluded that the evidence was properly admitted

23   under California law. Lodged Doc. 3 at 48. The California Supreme Court, without comment,

24   declined to grant review on this issue. Lodged Doc. 5.

25                B. <u>Analysis</u>

26         Failure to comply with the state's rules of evidence is not a sufficient basis for granting

27   federal habeas relief. <u>Jammal v. Van de Kamp</u>, 926 F. 2d 918, 919 (9th Cir. 1991). In order to

28   prevail on his federal due process claim, petitioner must again show that "admission of the

1    evidence so fatally infected the proceedings as to render them fundamentally unfair." <u>Id.</u>  As the

2    California Supreme Court has observed, "'[w]hen the perpetrator's race is unknown, the

3    frequencies with which the matched profile occurs in various racial groups to which the

4    perpetrator *might* belong are relevant for the purpose of ascertaining the rarity of the profile.'"

5    <u>People v. Wilson</u>, 38 Cal. 4th 1237, 1240 (2006).

6        Petitioner's reliance on <u>People v. Pizarro</u>, 110 Cal.App.4th 530, 628 (2003), to support his

7    position that the probability statistics should have been presented using a neutral, non-ethnic

8    population, is misplaced, as that case addressed a scenario where the prosecution informed the

9    jury that the relevant population chosen (Hispanic) was based on the defendant's ethnicity,

10   thereby potentially lowering the prosecution's burden of proof.  <u>Id.</u> at 628.  In this case, the

11   perpetrator's race was unknown, so the same reasoning does not apply.  The last reasoned

12   decision by the California Court of Appeal correctly held that it was bound by the California

13   Supreme Court's decision in <u>Wilson</u>, therefore the California Court of Appeal correctly

14   determined that the trial court's admission of this evidence did not lower the prosecution's burden

15   of proof.[8]  Petitioner was not in any way deprived of his right to a fair trial.  No holding of the

16   U.S. Supreme Court prohibited the testimony at issue.  Accordingly, relief should be denied on

17   this claim.

18                                  <u>CONCLUSION</u>

19       For all the reasons explained above, the state court's denial of petitioner's claims was not

20   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

21   RECOMMENDED that the petition for writ of habeas corpus be denied.

22       These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

24   after being served with these findings and recommendations, any party may file written

25   objections with the court and serve a copy on all parties.  Such a document should be captioned

26

27   [8] Pursuant to <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991), this court looks through the unexplained
     decision of the California Supreme Court and uses the last reasoned opinion of the California
28   Court of Appeal as the basis of this court's AEDPA review for reasonableness.

1  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

2  he shall also address whether a certificate of appealability should issue and, if so, why and as to

3  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

4  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.  §

5  2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

6  service of the objections.  The parties are advised that failure to file objections within the

7  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

8  F.2d 1153 (9th Cir. 1991).

9  DATED:  May 15, 2014

10

11  ALLISON CLAIRE
    UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28